Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1448
(973) 824-9300 (phone)
(973) 824-8425 (fax)
kmarino@khmarino.com
jtortorella@khmarino.com

OF COUNSEL:
Richard F. Levy (motion for *pro hac vice* pending)
Christine I. Lee (motion for *pro hac vice* pending)
Andrew M. Banks (motion for *pro hac vice* forthcoming)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, New York 10022-3908
212-891-1600 (phone)
212-909-0843 (fax)
RLevy@jenner.com
CILee@jenner.com
ABanks@jenner.com

Dana Sussman (motion for *pro hac vice* pending)
SAFE HORIZON ANTI-TRAFFICKING
PROGRAM
50 Court Street, 8th Floor
Brooklyn, NY 11201
718-943-8641 (phone)
718-943-8653 (fax)
Dana.Sussman@safehorizon.org

*Attorneys for Plaintiff Maria Rios Fun*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MARIA RIOS FUN,<br><br>     *Plaintiff*,<br><br>v.<br><br>MARITA PUERTAS PULGAR,<br>ALEXIS AQUINO ALBEGRIN, and<br>ANGELICA PULGAR,<br><br>     *Defendants*. | **Civil Action No.: 2:13-cv-03679-SRC-CLW**<br><br><br>**AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL** |

Plaintiff Maria Rios Fun ("Ms. Rios Fun" or "Plaintiff"), by and through her undersigned

attorneys, brings this action against Defendants, Marita Puertas Pulgar ("Marita Pulgar"), Alexis

Aquino Albegrin ("Albegrin") and Angelica Pulgar ("Angelica Pulgar") (collectively "Defendants"), alleging as follows:

## INTRODUCTION

1.      This is an action for damages and injunctive relief brought by Ms. Rios Fun, who was trafficked into the United States and forced by Defendants to work against her will as a domestic servant in the Wayne, New Jersey residence of Defendants Marita Pulgar and Albegrin (collectively "New Jersey Defendants") for over six months before she was able to escape.

2.      Human trafficking includes the recruitment, harboring, transportation, provision or obtaining of a person through the use of force, fraud or coercion for the purpose of subjection to servitude, peonage, debt bondage or slavery.

3.      Defendants, Marita Pulgar, Albegrin, and Angelica Pulgar, created and participated directly in a racketeering enterprise to traffic and harbor Ms. Rios Fun, in violation of 18 U.S.C. 1962(c) and (d) ("RICO") and  N.J. Stat. Ann. § 2C:41-2c and d ("New Jersey RICO"), and violated other Federal and State Laws, as set forth below.

4.      Ms. Rios Fun seeks to recover compensatory damages—trebled pursuant to the provisions of federal and New Jersey RICO laws—punitive and liquidated damages; recover attorneys' fees and costs; recover pre- and post-judgment interest; secure the immediate return of her personal property, including her passport; and receive a restraining order enjoining New Jersey Defendants from harassing her, pursuant to the Trafficking Victims Protection Act of 2000 and the Trafficking Victims Protection Reauthorization Act of 2003, 2005, 2008, and 2013; Fair Labor Standards Act; New Jersey State Labor Law regarding minimum wage, overtime and the frequency of payments; federal and New Jersey RICO laws; New Jersey common law; and New Jersey Statute §§ 2C:33-4 and 2C:25-28.

2

<u>**JURISDICTION AND VENUE**</u>

5.      This Court's subject-matter jurisdiction rests upon 28 U.S.C. § 1331 and 18 U.S.C. § 1964.  Supplemental jurisdiction over state law claims exists under 28 U.S.C. § 1367.

6.      Venue is proper in this district pursuant to 18 U.S.C. § 1391 and § 1965 because at all material times New Jersey Defendants resided or maintained their principal place of residence in this District.  In addition, a substantial part of the acts and occurrences giving rise to this Amended Complaint arose in this District.

<u>**PARTIES**</u>

<u>***Plaintiff***</u>

7.      Plaintiff is a 42-year-old citizen of Peru, who now, after she escaped the custody and control of Defendants, resides in the State of New York.  She entered the United States on a valid G-5 visa.  Plaintiff is the victim of the racketeering scheme conducted by the individual Defendants through a pattern of racketeering, including trafficking in persons, alien harboring, mail and wire fraud, as well as other unlawful acts described herein.

<u>***Defendants***</u>

8.      Defendants Marita Pulgar and Albegrin are citizens of Peru.  They are unmarried partners and the parents of four children.  New Jersey Defendants and their four children constitute the "Pulgar New Jersey Household."  At all times relevant to this action they resided at 323 Black Oak Ridge Road, Wayne, New Jersey, 07470 (the "Pulgar–Albegrin Residence").

9.      Defendant Angelica Pulgar is a citizen of Peru.  Defendant Angelica Pulgar is the mother of Defendant Marita Pulgar.  Defendant Angelica Pulgar is not a member of the Pulgar New Jersey Household, but was a guest of New Jersey Defendants at the Pulgar–Albegrin Residence when Ms. Rios Fun was trafficked to the United States in October 2012.  Upon

information and belief, Defendant Angelica Pulgar currently resides and maintains her household at 1° Caudra de Velasco Astete, Calle 28, Apt. 7, San Borja Norte, Peru.

## FACTUAL ALLEGATIONS

**A.     Trafficking in Persons**

10.     Trafficking in persons is a global phenomenon and an egregious human rights violation.  The U.S. government estimates that approximately 27 million men, women and children are trafficking victims at any given time.[1]

11.      Human traffickers prey on vulnerable members of society.  They typically trick, coerce or win the confidence of their victims through false promises of a better life.[2]  Victims are often lured with false promises of good jobs and better lives, only to find themselves trapped in brutal or dangerous conditions.[3]

12.     Trafficking is a transnational criminal enterprise, generating billions of dollars each year.[4]  It is the fastest-growing source of profits for organized criminal enterprises worldwide.[5]

13.     To combat trafficking, the United States has joined 113 other nations to become a party to the United Nations Protocol to Prevent, Suppress, and Punish Trafficking in Persons.  In 2000, Congress enacted the Trafficking Victims Protection Act to combat trafficking in persons for the purpose of forced labor and forced prostitution.

14.     There is credible evidence of a pattern of human trafficking abuse and exploitation of domestic workers by Peruvian diplomats and consular officials and that Peru

---

[1]  U.S. Dep't of State, Trafficking in Persons Report at 7 (June 2013).
[2]  Id. at 8, 18, 20, 31.
[3]  U.S. Dep't of Justice, Attorney General's Annual Report to Congress on U.S. Government Activities to Combat Trafficking in Persons, Fiscal Year 2011 at 1 (February 1, 2013).
[4]  U.S. Dep't of Justice, Trafficking in Persons Report at 13–14 (June 2005) ("According to the U.S. Federal Bureau of Investigations, human trafficking generates an estimated $9.5 billion in annual revenue.").
[5]  Findings, Pub. L. No. 106-386 at § 102(b)(8), 114 Stat. 1464, 1467.

tolerates such behavior.  In 2011, Rosmery Jakelyn Martell Villarreal, a domestic worker, filed a federal lawsuit against her traffickers, Jose Raul Corbera Tenorio, an employee of the Peruvian Embassy, and his wife, Katherine Cabieses Sanchez, asserting violations of the TVPRA and various other state and federal statutes in federal district court in Maryland.[6]  In 2011, Damayan Migrant Workers Association, Inc., an organization of Filipino domestic workers, published an online petition to then-Secretary Clinton requesting that the State Department enforce Section 203(a)(2) of the Trafficking Victims Protection Reauthorization Act of 2008 and suspend the issuance of A-3 and G-5 visas to workers seeking visas in seven countries, including Peru.[7]

15.     In light of this growing group of cases involving the exploitation of Peruvian workers and Ms. Rios's experiences, non-governmental organizations and pro bono representatives of victims of trafficking have submitted a separate letter to Secretary Kerry requesting the suspension of A-3 and G-5 visas to Peru.

## B.     Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise

16.      Some traffickers are part of large criminal organizations.  Others, like Defendants and co-conspirators in this case, are individuals who join together to traffic human beings for personal profit and benefit.

17.     Each of the individual Defendants are members of the Pulgar-Albegrin extended family.  Defendants Marita Pulgar and Albegrin are unmarried partners with four children. Defendant Angelica Pulgar is Defendant Marita Pulgar's mother.  New Jersey Defendants along

---

[6] Villareal v. Corbera Tenorio, No. 11-cv-02147-JFM (D. Md. filed Aug. 9, 2011).
[7] Section 203(a)(2) of the Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1375c, provides that the State Department shall suspend the issuance of A-3 or G-5 visas to applicants seeking to work for officials of a diplomatic mission or an international organization if the Secretary determines there is credible evidence that one or more employees of a diplomatic mission or international organization have abused or exploited one or more non-immigrants holding an A-3 or a G-5 visa, where the diplomatic mission or international organization tolerated such actions.

with Defendant Angelica Pulgar seemed by all outward appearances a normal extended family. New Jersey Defendants kept and operated a household in Wayne, New Jersey while working at the Permanent Mission of Peru to the United Nations.  Defendant Angelica Pulgar stayed temporarily as a guest of the New Jersey Defendants at the Pulgar–Albegrin Residence as a doting grandmother after New Jersey Defendants' fourth child was born.

18.     Despite the appearance of being no more than members of a normal extended family and doing no more than operating a normal household, New Jersey Defendants also managed and directed a Human Trafficking and Alien Harboring Enterprise.  The core group of the Human Trafficking and Alien Harboring Enterprise consisted of New Jersey Defendants and Angelica Pulgar.  New Jersey Defendants also recruited a friend, and other members of the Pulgar–Albegrin family in Peru, to the Human Trafficking and Alien Harboring Enterprise. Over the course of 2011, 2012, and 2013, the Human Trafficking and Alien Harboring Enterprise functioned as a continuing unit, during which time each member took actions that were related to each other, directed toward the same victim, had the same results, had the same participants, and were committed for same purposes:  to traffic Ms. Rios Fun across international borders such that New Jersey Defendants could benefit from Ms. Rios Fun's forced labor and housekeeping, child-care, and cleaning services at a cost far below minimum wage.

19.     New Jersey Defendants managed the Human Trafficking and Alien Harboring Enterprise.  They (New Jersey Defendants) directed Defendant Angelica Pulgar to approach and recruit Ms. Rios Fun to be a domestic worker for New Jersey Defendants; Defendant Marita Pulgar called Ms. Rios Fun to offer her a position as a domestic worker and described favorable terms and working conditions that New Jersey Defendants had no intention of honoring; Defendant Marita Pulgar mailed a copy of the employment contract that they had no intention of

honoring to a friend of New Jersey Defendants in Peru, with instructions to have Ms. Rios Fun

sign the employment contract and return it; they paid and arranged for Ms. Rios Fun's transport

to the United States, including buying airplane tickets and arranging for a passport and visa for

Ms. Rios Fun; they emailed and called Ms. Rios Fun in Peru to work out the logistics of her

transport to the United States; they worked with Defendant Angelica Pulgar to use coercive and

abusive action to keep Ms. Rios Fun trapped and working at the Pulgar–Albegrin Residence for

16 hours a day, seven days a week with little to no pay; and they directed members of Defendant

Albegrin's family in Lima, Peru to harass and threaten Ms. Rios Fun's family with the goal of

having Ms. Rios Fun return to her life of forced labor in the Pulgar–Albegrin Residence after she

had escaped.

       20.     At all times, Defendants and other members of the Human Trafficking and Alien

Harboring Enterprise knew that New Jersey Defendants did not intend to comply with the

contractual provisions.  Yet each of the Defendants and other members of the enterprise

knowingly played a role in trafficking and/or harboring Ms. Rios Fun and took affirmative steps

to facilitate the purposes of the Human Trafficking and Alien Harboring Enterprise, including:

All Defendants fraudulently enticed Ms. Rios Fun to contract to work for New Jersey

Defendants—with Defendant Marita Pulgar using mail, phone and the Internet to achieve such

action; a friend of New Jersey Defendants agreed to receive by mail a copy of the employment

contract that New Jersey Defendants had no intention of honoring and arranged for Ms. Rios Fun

to sign the document; New Jersey Defendants transported Ms. Rios Fun to the United States; all

Defendants forced Ms. Rios to perform household, child-care, and other cleaning duties for

approximately 16 hours a day, seven days a week; all Defendants exploited her by paying her

little to no compensation for her work; all Defendants used coercive and abusive actions to

7

ensure that Ms. Rios Fun would remain trapped in the Pulgar–Albegrin Residence; New Jersey Defendants and members of Defendant Albegrin's family harassed and threatened Ms. Rios and her family with the intention of pressuring Ms. Rios Fun to return to her life of forced labor.

21.     The Human Trafficking and Alien Harboring Enterprise controlled every aspect of Ms. Rios Fun's life once she arrived in the United States.

**C.    Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Recruitment by Deception and Fraud and Transport of Ms. Rios Fun to the United States**

22.     New Jersey Defendants along with Defendant Angelica Pulgar and other friends and family of the Pulgar–Albegrin household worked together to recruit Ms. Rios Fun and unlawfully traffic her across international borders, so that Defendants could take advantage of the daily and continuous service of Ms. Rios Fun at a cost far below minimum wage.

23.     To induce Ms. Rios Fun to enter their employ in the United States, New Jersey Defendants prepared and induced Ms. Rios Fun to sign a detailed written employment contract covering every aspect of Ms. Rios's proposed employment, including compensation, overtime, living quarters, duties, and time off.  A true correct and copy of the Contract is attached to this Amended Complaint as Exhibit A.[8]  As appears from their later conduct, New Jersey Defendants did not intend to comply with the contractual provisions, and, as set forth below, violated every important provision in the Contract.

24.     Each of the Defendants knowingly recruited Ms. Rios Fun and obtained forced labor and services and New Jersey Defendants knowingly transported Ms. Rios Fun to the United States to benefit from her forced labor and services in violation of 18 U.S.C. § 1590.

---

[8]  In accordance with Fed. R. Civ. P. 5.2, the passport and national identity numbers (DNI) contained in the Contract have been partially redacted.

25.     In or around December 2011 or January 2012, Defendant Angelica Pulgar approached Ms. Rios Fun by calling her to discuss the prospect of Ms. Rios Fun going to work for New Jersey Defendants as a domestic worker.  Defendant Angelica Pulgar explained to Ms. Rios Fun that her daughter was having trouble with the domestic worker whom New Jersey Defendants' employed at the time and that they were looking for a replacement.  Ms. Rios Fun responded that if the opportunity arose to work for New Jersey Defendants in the United States that she would appreciate more information.

26.     In August or September 2012, Defendant Marita Pulgar followed up on her mother's initial recruitment effort and called Ms. Rios Fun to offer Ms. Rios Fun a position as a live-in domestic worker for New Jersey Defendants in the United States.  Ms. Rios Fun agreed.

27.     In or around September 2012, Defendant Marita Pulgar sent Ms. Rios Fun the Contract, by mailing it to Defendant Marita Pulgar's friend in Peru, who then presented it to Ms. Rios Fun for signature.

28.     The Contract was Ms. Rios Fun's first and only experience with a written contract for employment.

29.     The Contract was a detailed written agreement covering every aspect of Ms. Rios Fun's proposed employment, and included provisions favorable to Ms. Rios-Fun for compensation, overtime, living quarters, duties, and time off.  New Jersey Defendants had no intention of honoring the terms of the Contract.

30.     Ms. Rios Fun and Defendant Marita Pulgar each signed the Contract in or around September 2012.  Ms. Rios Fun signed the contract in Peru and gave the signed contract, as instructed by Defendant Marita Pulgar, to a friend of New Jersey Defendants to deliver to New Jersey Defendants.

31.     In or around September and October 2012, Defendant Marita Pulgar sent emails to Ms. Rios Fun's son.  These emails included information about necessary paperwork Ms. Rios Fun needed to obtain and her transport to the United States.  This information included instructions on how to get a visa, how to get to the embassy, questions she would be asked at the embassy, New Jersey Defendants' address in the United States, and information for the flight for which New Jersey Defendants paid to transport Ms. Rios Fun to the United States.

32.     In addition, in or around September and October 2012, Defendant Marita Pulgar frequently spoke to Ms. Rios Fun by telephone to coordinate necessary paperwork and logistics for Ms. Rios Fun's transport to the United States.  Defendant Marita Pulgar frequently spoke to Ms. Rios Fun by telephone to check on the status of the passport and visa.

33.     When Ms. Rios Fun arrived in the United States, the Defendants confiscated her passport and visa, and immediately put Ms. Rios Fun to work in the Pulgar-Albegrin Residence.

**D.     Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise:  Breach of Nearly Every Substantive Term of the Contract**

34.     The Contract provided in the Second Paragraph on the first page that Ms. Rios Fun would work 7 hours a day on 5 days per week for a total of 35 hours per week.  In violation of the Contract, Defendants required Ms. Rios Fun to work approximately 16 hours per day, 7 days per week.

35.     The Contract provided in the Second Paragraph on the first page that Ms. Rios Fun would have two days off every week, and in the Second Paragraph on the first page and the Fifth Paragraph on the second page that she would be entitled to paid holidays, sick days, and paid vacation of 15 days per year.  In violation of the Contract, Defendants forced Ms. Rios Fun to work the same hours on Saturdays and Sundays and perform basically the same tasks as she did on weekdays.  In further violation of the Contract, Defendants permitted Ms. Rios Fun only a

total of three full days off in the more than six-month period that she forcibly worked for New Jersey Defendants.  Though Ms. Rios Fun regularly asked for the days off she was promised in the Contract, Defendants did not respond to these many requests except to suggest that Ms. Rios Fun's requests for a regular day off were outlandish.  Worse, as alleged in further detail below, even when Ms. Rios Fun had a medical reason for her absence, such as oral surgery, Defendants would not permit Ms. Rios a full day off.

36.     The Contract provided in the Third Paragraph on the first page and the Second Paragraph on the second page that Ms. Rios Fun would be paid a salary of $9.82 per hour for the first 35 hours of work per week, and overtime pay of $14.73 for every hour thereafter.

37.     Based on the number of days she worked and the hourly wages set by the Contract, New Jersey Defendants should have paid $36,000 to Ms. Rios Fun for the more than six months that she worked 16 hours per day, 7 days per week for the New Jersey Defendants.

38.     However, in violation of the Contract, New Jersey Defendants grossly underpaid Ms. Rios Fun[9] or failed to pay her at all each month.  Despite the contractual provisions in the Third Paragraph on the first page and the Second Paragraph on the second page, Defendants informed Ms. Rios Fun that she was entitled to only a flat rate of $900 per month.  And even then, Defendants failed to pay her even that paltry amount.  On average, New Jersey Defendants paid her or wired money to her family in the amount of approximately $400-$500 each month. New Jersey Defendants failed to pay her at all for the month of April 2013.  Had New Jersey Defendants paid her the amount due under specific terms of the Contract, Ms. Rios Fun should have received approximately $6,000 each month for the more than 450 hours she worked each month.

---

[9] Additional Damages claimed by Plaintiff Ms. Rios are set forth in the Prayer for Relief below.

39.     The Contract provided in the Third Paragraph of the first page that Ms. Rios Fun would receive her salary in full every month, without any deductions.  In violation of the Contract, New Jersey Defendants failed to pay her in full each month.  Even from the flat rate of $900 per month that was grossly short of the wages she was promised in her Contract, New Jersey Defendants deducted the purported cost of items they bought for Ms. Rios Fun without her consent, including the cost of clothes and toiletries for which she did not ask.  For example, upon Ms. Rios Fun's arrival to the United States, Defendant Marita Pulgar rejected her wardrobe as inadequate and forced Ms. Rios Fun to go shopping with her for better clothing.  Defendant Marita Pulgar purchased those items for Ms. Rios Fun.  New Jersey Defendants then deducted the purported cost of those items from Ms. Rios Fun's flat amount of $900 per month.  Defendant Marita Pulgar also provided toiletries for Ms. Rios Fun that Ms. Rios Fun did not request.  New Jersey Defendants later deducted the purported cost of the toiletries from Ms. Rios Fun's pay.

40.     The Contract provided in the Second Paragraph on the second page that Ms. Rios Fun would have a bedroom and a bathroom for her exclusive use.  New Jersey Defendants' home in Wayne, New Jersey, comprised two floors with a basement, four bedrooms, three bathrooms, two living rooms, one television room and a kitchen.  In violation of the Contract, Defendants forced Ms. Rios Fun to sleep in the unheated, cold basement, which was also used for laundry, storage and included a space that the children frequently used to watch movies.  When the children watched movies at night, Ms. Rios Fun could not go to bed.  Further in violation of the terms of the Contract, Defendants forced Ms. Rios Fun to share her bathroom with the children who frequently used it when they were in the basement.  Because she had no privacy, she was required to change her clothes in the bathroom.

41.     The Contract provided in the Fifth Paragraph on the first page and the Second Paragraph on the second page that Ms. Rios Fun would be provided food, three meals per day, six days per week.  In violation of the Contract, as detailed further below, Defendants withheld food as a means to control her.  Defendants generally prohibited Ms. Rios Fun from eating the family's food and frequently made Ms. Rios Fun go hungry.

42.     The Contract provided in the Fifth Paragraph on the first page that Defendant Marita Pulgar would provide medical insurance naming Ms. Rios Fun as beneficiary.  In violation of this Contract, New Jersey Defendants did not provide medical insurance with Ms. Rios Fun as beneficiary.  For example, there was no medical insurance to cover any portion of the bill of approximately $266 for Ms. Rios Fun's dental surgery described above.

43.     The Contract provided in the Sixth Paragraph on the first page and the Second Paragraph on the second page that Ms. Rios Fun's presence in New Jersey Defendants' residence would not be required except during work hours.  In violation of the Contract, New Jersey Defendants refused to allow Ms. Rios Fun any days off except for the three days off she was permitted to take over the more than six months she worked for New Jersey Defendants.

44.     Ms. Rios Fun was ordered to remain in the Pulgar–Albegrin Residence at all times except when necessary to take care of the children.  Defendants, including Defendant Angelica Pulgar, ordered Ms. Rios Fun not to interact or speak with anyone outside the house.

45.     The Contract provided in the Sixth Paragraph on the first page that under no circumstances would Defendants retain any personal property of Ms. Rios Fun specifically including, among other things, her passport or visa.  The Contract further provided in the Seventh Paragraph on the third page that identity and travel documents of Ms. Rios would remain in her possession at all times.  In violation of the Contract, New Jersey Defendants

strictly enforced their order that Ms. Rios Fun's passport and visa be kept by New Jersey

Defendants.  Ms. Rios Fun was instructed that she could not take her passport or visa with her

when she left on one of her very few days off.

      46.    The Contract provided in the First Paragraph on the first page that Ms. Rios Fun

would work as a "housekeeper," and Ms. Rios Fun was led to believe and understood that she

would not be responsible for supervising the children or any other person in addition to taking

care of the house.  In violation of the Contract, Ms. Rios Fun was required to perform

substantially more duties than those of a normal housekeeper, as detailed below.

      47.    New Jersey Defendants and Defendant Angelica Pulgar required Ms. Rios Fun to

complete tasks every day for more than 16 hours a day.  In the early morning, Ms. Rios Fun

attended to the two older children and prepared their breakfasts and lunches and served them

breakfast.  Ms. Rios Fun woke up the two younger children, the baby, who was 18 months old at

the time, and the four-year old.  Ms. Rios Fun fed and changed the baby and the four-year old

and prepared the four-year old for pre-school, then took the children to school.  During the day,

Ms. Rios Fun watched the baby; cleaned the bedrooms, bathrooms, living room, and dining

room; did laundry for the entire family; and was required to hand wash the baby's and the four-

year old's clothes.  In the middle of the day, Ms. Rios Fun picked up the four-year old from pre-

school.  In the afternoon, Ms. Rios Fun picked up the older children from school, and fed and

supervised the children.  In the evening, Ms. Rios Fun bathed the younger children; cooked and

fed them dinner; and straightened up the house in preparation for New Jersey Defendants' return

home.  Ms. Rios Fun put the younger children to bed, and often was required to lay with the

four-year old until she fell asleep, which could take several hours.  New Jersey Defendants

usually returned home around 8 p.m., and Ms. Rios Fun was required to attend to them until

around 10 p.m.  When New Jersey Defendants did not return home until as late as 1 a.m., as they did from time to time, Ms. Rios Fun was required to wait up for them until they arrived home. Ms. Rios Fun was also required to regularly water the garden by carrying heavy buckets of water.

48.     When New Jersey Defendants left on trips, they demanded even more of Ms. Rios Fun.  In or around November 2012, Defendants Marita Pulgar and Albegrin and their two older children travelled to Italy.  While New Jersey Defendants were traveling with the two older children, they ordered Ms. Rios Fun to care for the two younger children, and to attend to Defendant Angelica Pulgar, Defendant Marita Pulgar's mother, 24 hours per day.  Ms. Rios Fun was ordered to sleep on a mattress on the floor of New Jersey Defendants' bedroom, next to the youngest child's crib, so that she could take care of the baby throughout the night.  When the baby cried and Ms. Rios Fun rose to take care of her, Defendant Angelica Pulgar entered the room and screamed at Ms. Rios Fun, questioning why the baby was crying and why Ms. Rios Fun was not taking better care of the baby.

49.     Ms. Rios Fun struggled to complete all of her housekeeping tasks while supervising the children.  On several occasions, she informed Defendant Marita Pulgar that she would not be able to complete all of her tasks because she had to watch the children, including the baby.  Defendant Marita Pulgar angrily dismissed Ms. Rios Fun's concerns, and told Ms. Rios Fun that she had to do her work.

50.     New Jersey Defendants frequently had guests stay at the Pulgar–Albegrin Residence for several days or weeks at a time.  Defendants required that Ms. Rios Fun attend to all visitors in addition to her regular responsibilities.  For example, upon Ms. Rios Fun's arrival in October 2012, Defendant Angelica Pulgar was visiting New Jersey Defendants.  Defendant

Angelica Pulgar visited with New Jersey Defendants and stayed at the Pulgar–Albegrin Residence until mid-December 2012.  During that time, Defendant Angelica Pulgar demanded many tasks of Ms. Rios Fun and harshly criticized Ms. Rios Fun's performance of these tasks. Defendant Angelica Pulgar insisted that Ms. Rios Fun wait on her.  This included tasks such as Ms. Rios Fun cooking all of Defendant Angelica Pulgar's meals, serving Defendant Angelica Pulgar, cleaning Defendant Angelica Pulgar's bedroom, and laundering Defendant Angelica Pulgar's sheets and towels.  Further, when Ms. Rios Fun cleaned the house, Defendant Angelica Pulgar trailed at Ms. Rios Fun's heels, complaining that Ms. Rios Fun had not completed her tasks proficiently, and often ordered Ms. Rios Fun to complete these tasks again.  When Ms. Rios Fun prepared meals, Defendant Angelica Pulgar constantly asked why Ms. Rios Fun cooked a dish a particular way and criticized the quality of her cooking.  Defendant Angelica Pulgar ordered Ms. Rios Fun to wash the clothes of New Jersey Defendants' 15 year-old son by hand.  When visitors, including but not limited to Defendant Angelica Pulgar, stayed at the Pulgar–Albegrin Residence, they also demanded Ms. Rios Fun's labor and services.

51.     Despite receiving the significant benefits of Ms. Rios Fun's forced labor and services, at no time did Defendant Angelica Pulgar compensate or offer to compensate Ms. Rios Fun for the labor and services Ms. Rios Fun provided to Defendant Angelica Pulgar during the approximately six weeks that Defendant Angelica Pulgar visited with New Jersey Defendants. At no time did any of the other visitors to the Pulgar–Albegrin Residence and guests of New Jersey Defendants compensate or offer to compensate Ms. Rios Fun.

52.     New Jersey Defendants also directed Ms. Rios Fun to complete tasks outside the Pulgar–Aguilar Residence that they would otherwise have to hire and pay outside contractors to do.  For example, Defendant Marita Pulgar required that Ms. Rios Fun clean the four-year old

16

child's school, which is set up as a cooperative in which each child's family must clean the school once per month.  In addition to her regular duties at home, Ms. Rios Fun was required to clean the school's bathrooms, do the school's laundry, and clean the classrooms—tasks that New Jersey Defendants would have had to hire professional cleaning companies to complete at great additional expense.

**E.     Defendants' and Co-conspirators' Human Trafficking and Alien Harboring Enterprise: Coercion, Imprisonment and Forced Labor**

53.     Defendants, including Defendant Angelica Pulgar, intentionally obtained Ms. Rios Fun's forced labor and involuntary service through fraud and deception, and maintained and benefited from Ms. Rios Fun's labor and services through a pattern of abusive and coercive behavior designed to make Ms. Rios Fun believe that she could not leave Defendants' employ and had no choice but to keep working for them.

54.     Defendants placed Ms. Rios Fun in a state of complete dependence.  They were able to accomplish this involuntary servitude in part because Ms. Rios Fun neither spoke nor understood English and in large part by isolating her and withholding food and days off from Ms. Rios Fun, to make her believe that she had no choice but to continue to work for Defendants.

55.     Defendants received substantial benefits from the pattern of racketeering activity, including continuous and virtually free services and labor from Ms. Rios Fun.  New Jersey Defendants also had the benefit of substantial net income because they did not have to pay for the services that they were required to provide to the children's school.

56.     Each of the Defendants actively took steps to ensure that Ms. Rios Fun remained isolated and completely dependent on them.

57.     Ms. Rios Fun was not permitted to leave the house on her own, except to take the children to and from school.  Defendants knew that Ms. Rios Fun could not speak English.

Nevertheless, Defendant Angelica Pulgar repeatedly ordered Ms. Rios Fun not to speak to anyone outside the house and warned Ms. Rios Fun that the people in the United States were "bad."

58.     Defendants restricted Ms. Rios Fun's access and use of cell phones.  New Jersey Defendants told Ms. Rios Fun that she could not have a cell phone and did not permit her to make calls from their home, except on Sundays after 9 p.m.  Eventually Ms. Rios Fun purchased a cell phone, but she was only permitted to use the cell phone in the evenings after the children had gone to sleep.  Additionally, Defendant Angelica Pulgar threatened Ms. Rios Fun with termination if she used the telephone, warning her that the previous domestic worker New Jersey Defendants had employed used the phone too frequently and had been fired.

59.     Defendants repeatedly reminded Ms. Rios Fun of all of the things they had done for her, and that she should be grateful.  They told her that she was lucky to be in the United States, that they had spent money to bring her to the United States, and that they were helping to support her family in Peru through the wages they paid her.

60.     When insisting that Ms. Rios Fun should be grateful to Defendants, Defendant Angelica Pulgar told Ms. Rios Fun that previous domestic workers had been ungrateful to Defendants by not appreciating all that the Pulgar-Albegrin Family had done in bringing them to the United States.  Defendant Angelica Pulgar would tell Ms. Rios Fun that she was making a great deal of money.  These comments made Ms. Rios Fun feel indebted to Defendants and fear for her job and livelihood.

61.     Defendants opened Ms. Rios Fun's mail without her knowledge or permission and often did not even give her mail addressed to her.  For example, New Jersey Defendants did not give Ms. Rios Fun a letter addressed to her from the United Nations, which was intended to

apprise Ms. Rios Fun of her rights.  Ms. Rios Fun found the letter in Defendant Marita Pulgar's

desk when she was cleaning and copied it by hand.

62.     Defendant Angelica Pulgar regularly threatened Ms. Rios Fun, stating that if she

did anything wrong, Ms. Rios Fun's family in Peru would learn about it.

63.     By their conduct and demeanor, Defendants made clear to Ms. Rios Fun that they

were aristocratic, powerful, and professional people and that she was a lower-class servant girl.

This conduct caused Ms. Rios Fun to fear that they would send her home in disgrace if she

complained about the hours she was forced to work, the lower pay she received in comparison to

the pay that was agreed to in the Contract, her lack of privacy, or the inadequate food she was

given.  Defendants knew that Ms. Rios Fun's family, and in particular, her ill mother, was

relying on Ms. Rios Fun's meager earnings and took advantage of Ms. Rios Fun's need to

support her family.

64.     Defendants Marita Pulgar and Angelica Pulgar also created an environment of

fear and verbal abuse, frequently raising their voices and yelling at Ms. Rios Fun for very minor

mistakes.  For example, Ms. Rios Fun regularly prepared lunch for Defendant Marita Pulgar to

take with her to work.  If Ms. Rios Fun prepared lunch for her on a day she did not need to take

lunch with her, she would get angry and scream at Ms. Rios Fun.  Defendant Angelica Pulgar

frequently screamed at Ms. Rios Fun for purportedly taking poor care of the baby.  These

screaming sessions made Ms. Rios Fun fearful that even the smallest of perceived infractions,

such as insisting upon more reasonable hours per day or days off would lead to further abuse or

termination.

65.     Defendants used food as a means to control Ms. Rios Fun and coerce her into

dependence on them.  Defendants did not permit Ms. Rios Fun to eat the family's food.  New

Jersey Defendants bought food specifically for Ms. Rios Fun and monitored the food portions to ensure she was not eating more than they permitted.  New Jersey Defendants only provided Ms. Rios Fun with very basic food, such as bread and coffee, and Ms. Rios Fun frequently was hungry.  Defendant Angelica Pulgar would also prohibit Ms. Rios from eating food that was available around the house.  For example, Defendant Angelica Pulgar more than once pointed to a bowl of fruit and stated that the fruit was for Defendant Marita Pulgar only.  Defendant Angelica Pulgar expressly forbade Ms. Rios Fun from eating available bread until it was several days old and stale such that no one else in the house would eat it.  Ms. Rios Fun would occasionally beg for permission to have some of the family's food, which Ms. Rios Fun found degrading.  Ms. Rios Fun was only occasionally permitted to eat the family's leftovers. Defendant Angelica Pulgar threatened Ms. Rios Fun with termination if Ms. Rios Fun ate more than she was allotted, noting that the previous domestic worker was terminated because she ate too much food or ate the children's food.

66.     Defendants used the restriction of food and days off, despite express contractual obligations to the contrary, to further isolate Ms. Rios Fun and force her to work longer hours. For example, Ms. Rios Fun was not permitted to take a day off until on or around December 30, 2012, more than two months after she started working for Defendants.  Ms. Rios Fun did not know how to get to New York City.  Defendant Albegrin drove Ms. Rios Fun to a mall in New Jersey and Ms. Rios Fun took a bus from the mall to 42nd Street in New York City.  Defendant Marita Pulgar told Ms. Rios Fun before she left that if "[she] gets lost, it is [her] problem." When Ms. Rios Fun returned from her first day off, Defendant Marita Pulgar punished her for taking the day off.  Defendant Marita Pulgar had prepared a meal for her children, and made a point of counting the portions for each child.  She told the children in Ms. Rios Fun's presence

20

that they must all finish their food so that there would be no leftovers available for Ms. Rios Fun. On that occasion, because Ms. Rios Fun was relying on leftovers for her food, she went without dinner.

67.     In another instance, New Jersey Defendants withheld permission from Ms. Rios Fun to take a full day off or seek medical treatment despite the fact that she was in serious physical pain.  In or around January 2013, Ms. Rios Fun developed a severe toothache and inflammation which became very painful.  She asked New Jersey Defendants if she could see a dentist, but they refused to help her.  Defendant Albegrin told Ms. Rios Fun "this is not my problem."  After several weeks of Ms. Rios Fun suffering and begging for permission to see a dentist, Defendant Albegrin finally said "I'm tired of you complaining," and permitted Ms. Rios Fun to see a dentist.  Defendant Albegrin told Ms. Rios Fun that she must return home immediately after the appointment.  The dentist had to perform minor oral surgery, which required that Ms. Rios Fun stay longer than she had anticipated.  During the appointment, New Jersey Defendants called the dentist's office, asking where she was and demanding that she return home immediately.  The dentist insisted that Ms. Rios Fun could not return to their home right away.  Nevertheless, Ms. Rios Fun returned to New Jersey Defendants' home the same day and resumed working immediately, despite being in a great deal of pain.

68.     New Jersey Defendants also denied Ms. Rios Fun access to her passport and visa. New Jersey Defendants strictly enforced their order that they keep Ms. Rios Fun's passport.  She was not permitted to take her passport or visa with her on the mere three days off that New Jersey Defendants permitted her to take during the entire six months of her employment.

**F.     Plaintiff's Escape from Defendants**

69.     On or about April 27, 2013, Ms. Rios Fun was permitted to take a day off. During that day off, Ms. Rios Fun called the National Human Trafficking Resource Center

hotline.  Ms. Rios Fun learned of the hotline number from materials she received at the U.S.

Embassy in Lima, Peru and from the materials sent to her by the United Nations that she found

in Defendant Marita Pulgar's desk and hand transcribed so that she could place the originals

back in Defendant Marita Pulgar's desk.  She was afraid of not returning to New Jersey

Defendants' home, but she could not bear to continue working sixteen hours a day, every day,

with less than one day off per month.  She learned of her options by speaking with a person from

the hotline and decided she would not return to New Jersey Defendants' home.

70.     For the next several days, New Jersey Defendants called Ms. Rios Fun nonstop

demanding her return.

71.     A few days later, Defendant Albegrin's family in Lima, Peru approached Ms.

Rios Fun's family in Lima demanding to know where Ms. Rios Fun was hiding.  Defendant

Albegrin's family harassed and threatened Ms. Rios Fun's mother by telling her that New Jersey

Defendants would report Ms. Rios Fun to the police in the United States.  At that point, Ms. Rios

Fun's family did not even know she had escaped.

72.      On or around May 2013, Ms. Rios Fun, accompanied by local police, returned to

New Jersey Defendants' home to request the return of her property, including her passport and

personal items such as clothes, toiletries, and items for her children.  New Jersey Defendants

refused to turn over Ms. Rios Fun's property, told her they had thrown away her things,

including the items that they bought for her and for which they deducted the cost from her

wages, and claimed that they had already sent Ms. Rios Fun's passport to Peru to cancel her visa,

though the return of a passport is not required for cancellation of a visa.

**FIRST CLAIM FOR RELIEF**

Trafficking with Respect to Peonage, Slavery, Involuntary Servitude or Forced Labor in
Violation of the Trafficking Victims Protection Act of 2000
(18 U.S.C. §§ 1590, 1595)
Against All Defendants

73.     Plaintiff realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

74.     Defendants knowingly recruited, transported, and obtained Plaintiff's forced labor

and involuntary service in violation of 18 U.S.C. § 1590.

75.     Plaintiff brings this civil cause of action under 18 U.S.C. § 1595.

76.     By inducing Ms. Rios Fun to accept employment with them in the United States

through fraud and deception for purposes of subjecting her to a condition of involuntary

servitude and forced labor, Defendants intentionally and outrageously engaged in trafficking of

Ms. Rios Fun in violation of 18 U.S.C. § 1590.

77.     New Jersey Defendants subsequently paid for her tickets and procured a visa on

her behalf to allow her to travel and to enter the United States.

78.     New Jersey Defendants transported her to the United States and, upon her arrival,

harbored her in their home for the purpose of obtaining and exploiting her labor for little to no

pay and maintaining her involuntary servitude.

79.     Plaintiff suffered damages, including emotional distress, humiliation,

embarrassment, and lost wages, as a result of Defendants' conduct.  Pursuant to 18 U.S.C.

§ 1595, Plaintiff is entitled to recover actual damages, reasonable attorneys' fees, and punitive

and exemplary damages in amounts to be proven at trial, and such further relief as the court

deems proper.

## SECOND CLAIM FOR RELIEF
Forced Labor in Violation of the Trafficking Victims Protection Act of 2000
(18 U.S.C. §§ 1589, 1595)
Against All Defendants

80.    Plaintiff realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

81.    Defendants knowingly maintained and benefited from Ms. Rios Fun's labor and

services through a pattern3 of abusive and coercive behavior designed to make Plaintiff believe

that she had no choice but to keep working for them, in violation of the forced labor provisions

of 18 U.S.C. § 1589.

82.    Plaintiff brings this civil cause of action under 18 U.S.C. § 1595.

83.    Defendants forced Ms. Rios Fun into a position of forced labor by promising her,

but in fact failing to pay, adequate wages for work performed from October 26, 2012, until April

27, 2013.

84.    Ms. Rios Fun's forced labor was procured by Defendants' false promise of decent

wages and good working conditions, as articulated by the terms of an employment contract.

85.    Throughout the relevant period, Defendants made Ms. Rios Fun completely

dependent on them by isolating her, engaging in verbal abuse and psychological coercion, and

maintaining control over her passport and visa.

86.    As a result of Defendants' intentional and outrageous actions, Plaintiff was forced

to continue laboring for them and suffered damages, including emotional distress and lost wages.

Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover actual damages, reasonable

attorneys' fees, and punitive and exemplary damages in amounts to be proven at trial, and such

further relief as the court deems proper.

## THIRD CLAIM FOR RELIEF
Federal RICO Act
(18 U.S.C. § 1962(c))
Against All Defendants

87.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

88.     Defendants and other friends and extended family of New Jersey Defendants in Peru conducted and/or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity as specifically set forth above, in violation of 18 U.S.C. § 1962(c).

89.     Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

90.     Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

91.     New Jersey Defendants, Defendant Angelica Pulgar, a friend of New Jersey Defendants in Peru, and other members of the Pulgar–Albegrin family in Peru are an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Human Trafficking and Alien Harboring Enterprise").  The members of the Human Trafficking and Alien Harboring Enterprise are associated with each other as long-term unmarried partners—Defendants Marita Pulgar and Albegrin—and friends and extended family of New Jersey Defendants.  The Human Trafficking and Alien Harboring Enterprise functioned as a continuing unit throughout 2011, 2012, and 2013, during which time each member took actions that were related to each other, directed toward the same victim, had the same results, had the same participants, and were committed for the same purposes:  to traffic Ms. Rios Fun across international borders such that New Jersey Defendants could benefit from Ms. Rios Fun's forced labor and housekeeping, child-care, and cleaning services at a cost far below minimum wage.

92.     As described above, each of Defendants planned, participated in, sanctioned, and/or facilitated the multiple acts of racketeering activity of the RICO enterprise, including predicate acts of forced labor, in violation of 18 U.S.C. § 1589, and trafficking with respect to involuntary servitude and forced labor, in violation of 18 U.S.C. § 1590.  Additionally, as described above, New Jersey Defendants also planned, participated in, and sanctioned mail fraud in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

93.     The violations of 18 U.S.C. §§ 1589–90, 1341, and 1343—which each constitute racketeering activity within the meaning of 18 U.S.C. § 1961(1)—all occurred during the years 2011, 2012, and 2013, and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

94.     As a result of these predicate acts of human trafficking, forced labor, and wire and mail fraud, Plaintiff lost regular and overtime wages, which constitute an injury to business or property under 18 U.S.C. § 1964(c).

95.     Defendants' actions demonstrate an extended, continuous period of criminal activity and a threat of continued criminal activity that affect interstate and foreign commerce.

96.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages and costs and reasonable attorneys' fees in amounts to be proven at trial, and such further relief as the court deems proper.

**FOURTH CLAIM FOR RELIEF**
Federal RICO Act
(18 U.S.C. § 1962(d))
Against All Defendants

97.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98.     Defendants and other co-conspirators in Peru conspired with each other to violate 18 U.S.C. § 1962 as specifically set forth above, in violation of 18 U.S.C. § 1962(d).

99.     Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

100.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

101.    New Jersey Defendants, Defendant Angelica Pulgar, a friend of New Jersey Defendants in Peru, and other members of the Pulgar–Albegrin family in Peru are an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  The members of the Human Trafficking and Alien Harboring Enterprise are associated with each other as long-term unmarried partners—Defendants Marita Pulgar and Albegrin—and friends and extended family of New Jersey Defendants.  The Human Trafficking and Alien Harboring Enterprise functioned as a continuing unit throughout 2011, 2012, and 2013, during which time each member took actions that were related to each other, directed toward the same victim, had the same results, had the same participants, and were committed for the same purposes:  to traffic Ms. Rios Fun across international borders such that New Jersey Defendants could benefit from Ms. Rios Fun's forced labor and housekeeping, child-care, and cleaning services at a cost far below minimum wage.

102.    As described above, each of the Defendants conspired to facilitate the multiple acts of racketeering activity of the RICO enterprise, including predicate acts of forced labor, in violation of 18 U.S.C. § 1589, and trafficking with respect to involuntary servitude and forced labor, in violation of 18 U.S.C. § 1590.  Additionally, as described above, New Jersey Defendants conspired to facilitate the acts of mail fraud in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

103.    The violations of 18 U.S.C. §§ 1589–90, 1341, and 1343—which each constitute racketeering activity within the meaning of 18 U.S.C. § 1961(1)—all occurred during the years 2011, 2012, and 2013, and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

104.    As a result of these predicate acts of human trafficking, forced labor, and wire and mail fraud, Plaintiff lost regular and overtime wages, which constitute an injury to business or property under 18 U.S.C. § 1964(c).

105.    Defendants' actions demonstrate an extended, continuous period of criminal activity and a threat of continued criminal activity that affects interstate and foreign commerce.

106.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages and costs and reasonable attorneys' fees in amounts to be proven at trial, and such further relief as the court deems proper.

### FIFTH CLAIM FOR RELIEF
New Jersey RICO Act
(N.J. Stat. Ann. § 2C:41-2c)
Against All Defendants

107.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

108.    Defendants and other friends and extended family of New Jersey Defendants in Peru conducted and/or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity as specifically set forth above, in violation of New Jersey Statutes Annotated § 2C:41-2c.

109.    Plaintiff is a "person" with standing to sue within the meaning of New Jersey Statutes Annotated § 2C:41-4c.

28

110.    Each Defendant is a "person" within the meaning of New Jersey Statutes Annotated § 2C:41-1b.

111.    New Jersey Defendants, Defendant Angelica Pulgar, a friend of New Jersey Defendants in Peru, and other members of the Pulgar–Albegrin family in Peru are an "enterprise" within the meaning of New Jersey Statute Annotated § 2C:41-1c (the "Human Trafficking and Alien Harboring Enterprise").  The members of the Human Trafficking and Alien Harboring Enterprise are associated with each other as long-term unmarried partners—Defendants Marita Pulgar and Albegrin—and friends and extended family of New Jersey Defendants.  The Human Trafficking and Alien Harboring Enterprise functioned as a continuing unit throughout 2011, 2012, and 2013, during which time each member took actions that were related to each other, directed toward the same victim, had the same results, had the same participants, and were committed for same purposes:  to traffic Ms. Rios Fun across international borders such that New Jersey Defendants could benefit from Ms. Rios Fun's forced labor and housekeeping, child-care, and cleaning services at a cost far below minimum wage.

112.    As described above, each of the Defendants planned, participated in, sanctioned, and/or facilitated the multiple acts of racketeering activity of the RICO enterprise, including predicate acts of forced labor, in violation of 18 U.S.C. § 1589, and trafficking with respect to involuntary servitude and forced labor, in violation of 18 U.S.C. § 1590.  Additionally, as described above, New Jersey Defendants also planned, participated in, and sanctioned mail fraud in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

113.    The violations of 18 U.S.C. §§ 1589–90, 1341, and 1343 all constitute "racketeering activity" within the meaning of New Jersey Statutes Annotated § 2C:41-1a, which

defines racketeering activity to include, among other things, any conduct defined by the Federal RICO Act as "racketeering activity" under 18 U.S.C. § 1961(1)(A).

114.    The violations of 18 U.S.C. §§ 1589–90, 1341, and 1343 all occurred during the years 2011, 2012, and 2013, and constitute a "pattern of racketeering activity" within the meaning of New Jersey Statutes Annotated § 2C:41-1d.

115.    As a result of these predicate acts of human trafficking, forced labor, and wire and mail fraud, Plaintiff lost regular and overtime wages, which constitute an injury to business or property under New Jersey Statutes Annotated § 2C:41-4c .

116.    As mentioned above, Defendants' actions were related to each other, directed toward the same victim, had the same results, had the same participants, and were committed for the same or similar purposes.  Defendants' actions thus demonstrate an extended, continuous period of criminal activity and a threat of continued criminal activity.

117.    Pursuant to New Jersey Statutes Annotated § 2C:41-4, Plaintiff is entitled to recover treble damages and costs of the suit, including a reasonable attorneys' fee, costs of investigation, and litigation in amounts to be proven at trial, and such further relief as the court deems proper.

**SIXTH CLAIM FOR RELIEF**
New Jersey RICO Act
(N.J. Stat. Ann. § 2C:41-2d)
Against All Defendants

118.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

119.    Defendants and co-conspirators conspired with each other to violate New Jersey Statutes Annotated § 2C:41-2 as specifically set forth above, in violation of New Jersey Statutes Annotated § 2C:41-2d.

120.     Plaintiff is a "person" with standing to sue within the meaning of New Jersey Statutes Annotated § 2C:41-4c.

121.     Each Defendant is a "person" within the meaning of New Jersey Statutes Annotated § 2C:41-1b.

122.     New Jersey Defendants, Defendant Angelica Pulgar, a friend of New Jersey Defendants in Peru, and other members of the Pulgar–Albegrin family in Peru are an "enterprise" within the meaning of New Jersey Statute Annotated § 2C:41-1c (the "Human Trafficking and Alien Harboring Enterprise").  The members of the Human Trafficking and Alien Harboring Enterprise are associated with each other as long-term unmarried partners— Defendants Marita Pulgar and Albegrin—and friends and extended family of New Jersey Defendants.  The Human Trafficking and Alien Harboring Enterprise functioned as a continuing unit throughout 2011, 2012, and 2013, during which time each member took actions that were related to each other, directed toward the same victim, had the same results, had the same participants, and were committed for same purposes:  to traffic Ms. Rios Fun across international borders such that New Jersey Defendants could benefit from Ms. Rios Fun's forced labor and housekeeping, child-care, and cleaning services at a cost far below minimum wage.

123.     As described above, each of the Defendants planned, participated in, sanctioned, and/or facilitated the multiple acts of racketeering activity of the RICO enterprise, including predicate acts of forced labor, in violation of 18 U.S.C. § 1589, and trafficking with respect to involuntary servitude and forced labor, in violation of 18 U.S.C. § 1590.  Additionally, as described above, New Jersey Defendants also planned, participated in, and sanctioned mail fraud in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

124.    The violations of 18 U.S.C. §§ 1589–90, 1341, and 1343 all constitute "racketeering activity" within the meaning of New Jersey Statutes Annotated §2C:41-1a, which defines racketeering activity to include any conduct defined by the Federal RICO Act as "racketeering activity" under 18 U.S.C. § 1961(1)(A).

125.    The violations of 18 U.S.C. §§ 1589–90, 1341, and 1343  all occurred during the years 2011, 2012, and 2013, and constitute a "pattern of racketeering activity" within the meaning of New Jersey Statutes Annotated § 2C:41-1d.

126.    As a result of these predicate acts of human trafficking, forced labor, and wire and mail fraud, Plaintiff lost regular and overtime wages, which constitute an injury to business or property under New Jersey Statutes Annotated § 2C:41-4c .

127.    As mentioned above, Defendants' actions were related to each other, directed toward the same victim, had the same results, had the same participants, and were committed for same or similar purposes.  Defendants' actions thus demonstrate an extended, continuous period of criminal activity and a threat of continued criminal activity.

128.    Pursuant to New Jersey Statutes Annotated § 2C:41-4, Plaintiff is entitled to recover treble damages and costs of the suit, including a reasonable attorneys' fee, costs of investigation, and litigation in amounts to be proven at trial, and such further relief as the court deems proper.

**SEVENTH CLAIM FOR RELIEF**
Minimum Wage; Fair Labor Standards Act ("FLSA")
29 U.S.C. §§ 201 *et seq.*
Against New Jersey Defendants

129.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

130.     New Jersey Defendants violated the provisions of the FLSA, 29 U.S.C, §§ 201 et seq., by failing to pay Ms. Rios Fun, a live-in domestic worker, the greater of the federal or state minimum wage.  29 U.S.C. § 206(f); 29 C.F.R. § 552.102; 29 U.S.C. § 218(a).

131.     The federal minimum wage, during all times relevant, was $7.25 per hour. 29 U.S.C. § 206(a)(1).

132.     New Jersey Defendants were Plaintiff's employers within the meaning of the FLSA, 29 U.S.C. § 203(d).

133.     New Jersey Defendants were aware or should have been aware of the requirement to pay Plaintiff the statutorily defined minimum wage for her labor.

134.     New Jersey Defendants consistently failed to pay Plaintiff the minimum wage for hours worked as required under federal law for her work in New Jersey.

135.     New Jersey Defendants' failure to pay the minimum wage was willful.

136.     As a result of New Jersey Defendants' willful violations of the FLSA, under 29 U.S.C. § 216(b), Plaintiff is entitled to recover from New Jersey Defendants, jointly and severally, her unpaid wages, an additional equal amount in liquidated damages, and costs and reasonable attorneys' fees in amounts to be proven at trial, and such further relief as the court deems proper.

**EIGHTH CLAIM FOR RELIEF**
Minimum Wage and Overtime; New Jersey State Labor Law ("N.J. Lab. Law")
N.J. Stat. Ann. §§ 34:11-56a4, 34:11-56a25
Against New Jersey Defendants

137.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138.     Under New Jersey Labor Law, Plaintiff was entitled to be paid a lawful minimum wage for all hours worked in New Jersey Defendants' employment.

139.     At all relevant times, New Jersey Defendants were employers within the meaning of New Jersey Statutes Annotated § 34:11-56a1(g).

140.     At all relevant times, Plaintiff was an employee of New Jersey Defendants within the meaning of New Jersey Statutes Annotated § 34:11-56a1(h).

141.     During the period of Plaintiff's employment with Defendants, the minimum wage in New Jersey was $7.25 per hour for 40 hours of working time in any week and 1½ times Plaintiff's regular hourly wage for each hour of working time in excess of 40 hours in any week. N.J. Stat. Ann. § 34:11-56a4.

142.     During the period of Plaintiff's employment with New Jersey Defendants, New Jersey Defendants required Plaintiff to work approximately 16 hours per day, seven days a week, but failed to pay Ms. Rios Fun the statutorily mandated minimum and overtime wage.

143.     New Jersey Defendants were aware of or should have been aware of the requirement to pay Plaintiff the statutorily defined minimum wage and overtime compensation for her labor.

144.     New Jersey Defendants' failure to pay Plaintiff the minimum wage and overtime compensation was willful.

145.     As a result of New Jersey Defendants' willful violations of the New Jersey Labor Law, Plaintiff is entitled to recover the difference between wages due pursuant to the statute and the wages actually paid to her together with costs and reasonable attorneys' fees in amounts to be proven at trial, and such further relief as the court deems proper.

## NINTH CLAIM FOR RELIEF
Frequency of Payments; N.J. Lab. Law
N.J. Stat. Ann. § 34:11-4.2
Against New Jersey Defendants

146.     Plaintiff realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

147.     Under New Jersey Statute Annotated § 34.11-4.2, Plaintiff was entitled to

payment of the full amount of wages due to her at least twice during each calendar month.

148.     At all relevant times, New Jersey Defendants were employers within the meaning

of the New Jersey Statutes Annotated § 34.11-4.1(a).

149.     At all relevant times, Plaintiff was an employee of New Jersey Defendants within

the meaning of New Jersey Statutes Annotated § 34.11-4.1(b).

150.     At all relevant times, New Jersey Defendants failed to pay Ms. Rios Fun the full

amount of wages due to Plaintiff at least two times per calendar month in violation of New

Jersey Statutes Annotated § 34:11-4.2.

151.     New Jersey Defendants' failure to timely pay Plaintiff was willful.

152.     As a result of New Jersey Defendants' willful violations of New Jersey Labor

Law, Plaintiff is entitled to recover the full amount of unpaid wages due to Plaintiff and

reasonable costs and attorneys' fees in amounts to be proven at trial, and such further relief as the

court deems proper.

## TENTH CLAIM FOR RELIEF
Breach of Contract
Against Defendant Marita Pulgar

153.     Plaintiff realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

154.    Plaintiff and Defendant Marita Pulgar entered into a written contract, whereby Plaintiff agreed to work for New Jersey Defendants, and New Jersey Defendants agreed to pay Plaintiff $9.82 per hour for a thirty-five hour work week and overtime pay if work was performed beyond forty hours per week, with no deductions, and provide a room and bathroom for her, among other promises.

155.    Plaintiff and Defendant Marita Pulgar signed the Contract.

156.    Plaintiff has duly performed all conditions and covenants set forth under the employment contract.

157.    Defendant Marita Pulgar willfully and intentionally violated the terms of the employment contract.

158.    Defendant Marita Pulgar breached the terms of the parties' written contract by, among other things:  failing to adequately compensate Plaintiff for the hours she worked; failing to provide a bedroom and bathroom for her exclusive use and adequate meals; prohibiting Plaintiff from taking days off, paid holidays, sick days, and paid vacation in accordance with the terms of the Contract; and retaining Plaintiff's passport, visa, and other personal property.

159.    As a result of Defendant Marita Pulgar's breach of the employment contract, Plaintiff has suffered substantial injury, including unpaid wages, emotional distress, humiliation, and embarrassment.

160.    Plaintiff is entitled to recover any and all damages available to her, including compensatory and consequential damages in amounts to be proven at trial, including costs, attorneys' fees, and such further relief as the court deems proper.

## ELEVENTH CLAIM FOR RELIEF
Conversion
Against New Jersey Defendants

161.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

162.    New Jersey Defendants wrongfully took and maintained control and custody of Plaintiff's passport, visa, and other personal property without Plaintiff's consent and in direct contravention to the terms of the employment contract between Plaintiff and Defendant Marita Pulgar.

163.    Despite Plaintiff's demands upon New Jersey Defendants to return her property, New Jersey Defendants remain in possession of Plaintiff's passport, visa, and other personal property.

164.    New Jersey Defendants have willfully and recklessly disregarded Plaintiff's property rights.

165.    As a direct and proximate result of New Jersey Defendants' wrongful exercise and dominion and control over Plaintiff's personal property, Plaintiff has suffered substantial harm and injury.

166.    Ms. Rios Fun is entitled to the immediate return of her property, including her passport and personal items, such as items for her children, compensatory damages, special damages from the deprivation of use of the property, pre-judgment interest, costs, reasonable attorneys' fees, and punitive damages in amounts to be proven at trial, and such further relief as the court deems proper.

## TWELFTH CLAIM FOR RELIEF
Common Law Fraud
Against All Defendants

167.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

168.    Defendants materially misrepresented the terms and conditions of her employment, including her wages, living arrangements, paid time off, and benefits, among other terms and conditions.

169.    Defendants made these statements with knowledge that these representations were false, or with reckless disregard as to whether they would be able to provide such compensation or conditions of employment.

170.    Defendants made these statements with the intention that Plaintiff rely on them to her detriment.

171.    In justifiable reliance on Defendants' statements, Plaintiff followed Defendants to the United States.  She made the journey in the hopes of achieving financial security for herself and her family through Defendants' promised wage, living arrangements, and other conditions of employment.

172.    Defendants failed to pay Ms. Rios Fun the promised wages and failed to provide Ms. Rios Fun with the terms and conditions of the employment they promised her.

173.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff suffered substantial injury.

174.    Plaintiff is entitled to recover the compensatory and consequential damages she suffered as a result of Defendants' fraudulent misrepresentations and punitive damages in amounts to be proven at trial, and such further relief as the court deems proper.

## THIRTEENTH CLAIM FOR RELIEF
### Unjust Enrichment/*Quantum Meruit*
### Against All Defendants

175.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

176.    Plaintiff worked in good faith as a live-in domestic worker for New Jersey Defendants in the United States for approximately six months and for Defendant Angelica Pulgar for the six weeks that Defendant Angelica Pulgar lived with New Jersey Defendants.  During these time periods, Ms. Rios Fun worked approximately 16 hours per day, seven days a week, with only three days off.

177.    Plaintiff performed the services as a live-in domestic worker with the reasonable expectation that she would be compensated for her services at the time she performed.

178.    Defendants instructed, supervised, and accepted Plaintiff's services.

179.    Defendants failed to adequately compensate Plaintiff for her work, and New Jersey Defendants only compensated her with paltry sums at irregular intervals.

180.    Defendants have been unjustly enriched by obtaining substantial benefits at Plaintiff's expense in the form of inexpensive household labor and other domestic services.

181.    The benefits that Defendants derived from Ms. Rios Fun's labor came at enormous expense to her.

182.    Defendants created a severe power imbalance through isolation, manipulation, exploitation, and other means described herein, in order to prevent Ms. Rios Fun from either learning that she was entitled to a fair wage or challenging the circumstances of her employment.

183.    Fairness and good conscience mandate that Ms. Rios Fun receive fair compensation for the benefits she conferred upon Defendants at her expense.

184.     Plaintiff is entitled to recover additional damages in an amount to be proven at trial, and such further relief as the court may deem proper.

### FOURTEENTH CLAIM FOR RELIEF
Restraining Order on the Basis of Harassment
N.J. Stat. §§ 2C:33-4, 2C:25-28
Against New Jersey Defendants

185.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

186.     Under the New Jersey Prevention of Domestic Violence Act, Plaintiff is entitled to be free from harassment by Defendants. N.J. Stat. Ann. § 2C: 25-18.

187.     Plaintiff is protected by New Jersey domestic violence law as a "present or former household member." N.J. Stat. Ann. § 2C: 25-19(d).

188.     Domestic violence includes harassment as defined by N.J. Stat. Ann § 2C: 33-4.

189.     New Jersey Defendants committed harassment when they engaged in alarming and repetitive communications to the Plaintiff with the purpose to alarm or seriously annoy Plaintiff by repeatedly demanding she return to their home, threatening to call the police on her, and contacting her family without her knowledge.

190.     New Jersey Defendants' actions were committed with the purpose to harass Ms. Rios Fun.

191.     To prevent further harassment, Ms. Rios Fun is entitled to a restraining order enjoining Defendants from having any further contact with her or her family.

### JURY DEMAND

192.     Plaintiff requests a trial by jury.

### PRAYER

WHEREFORE, Plaintiff prays that this Court:

1. Enter judgment in favor of Plaintiff in each and every cause of action asserted in the Complaint;

2. Award compensatory and liquidated damages in an amount no less than approximately $66,000, including breach-of-contract damages, compensatory damages for human trafficking violations, and damages for violations of minimum wage laws to be calculated using the minimum wage for regular hours worked and the overtime wage rate set by the Contract for overtime hours worked;[10]

3. Award treble damages pursuant to Federal and State RICO laws;

4. Award punitive damages;

5. Order the immediate return of Plaintiff's personal property, including her passport and personal items such as clothes, toiletries, and items for her children;

6. Award Plaintiff her attorneys' fees and costs;

7. Award Plaintiff pre- and post-judgment interest;

8. Grant Plaintiff a restraining order enjoining Defendants from harassing her; and

9. Award any such other and further relief as the Court deems just and proper.

DATED this 22nd day of July, 2013.

Respectfully submitted,

Kevin Marino
kmarino@khmarino.com
John Tortorella
jtortorella@khmarino.com
MARINO, TORTORELLA & BOYLE, PC
437 Southern Boulevard
Chatham, NJ 07928
Tel: (973) 824-9300

---

[10] Aguilar v. D.D.S. Painting & Carpentry, Inc., No. 06-5295 (RBK), 2008 LEXIS 17137, at *9 (D.N.J. Mar. 4, 2008)

Fax: (973) 824-8425

Richard F. Levy (motion for *pro hac vice* pending)
Christine I. Lee (motion for *pro hac vice* pending)
Andrew M. Banks (motion for *pro hac vice* forthcoming)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, New York 10022-3908
212-891-1600 (phone)
212-909-0843 (fax)
RLevy@jenner.com
CILee@jenner.com
ABanks@jenner.com

-and-

Dana Sussman (motion for *pro hac vice* pending)
SAFE HORIZON ANTI-TRAFFICKING PROGRAM
50 Court Street, 8th Floor
Brooklyn, NY 11201
718-943-8641 (phone)
718-943-8653 (fax)
Dana.Sussman@safehorizon.org

*Attorneys for Plaintiff Maria Rios Fun*

# EXHIBIT A

## CONTRATO DE PRESTACION DE SERVICIOS

Conste por el presente documento, el contrato de prestación de servicios que celebran, de una parte, doña Marita Angélica Puertas Pulgar, de nacionalidad peruana, identificada con DNI ■■■8949 y Pasaporte No.■■0618 con domicilio en 323 Black Oak Ridge Road, Wayne, New Jersey, N.J. 07470, quien en adelante se denominará La Empleadora; y de la otra, doña María Esmeralda Ríos Fun, de nacionalidad peruana, identificada con DNI ■■■7503 y Pasaporte No. ■■0271, domiciliada en Lima, Perú, quien en adelante se denominará La Empleada, bajo los términos y condiciones siguientes:

**PRIMERO.-** Es objeto del presente contrato es la prestación de servicios que como empleada del hogar efectuará La Empleada en la residencia de La Empleadora, a partir del 15 de octubre de 2012.

**SEGUNDO.-** La Empleada trabajará treinta y cinco horas a la semana, y percibirá por hora de trabajo nueve dólares con ochentaidos centavos (US$ 9.82). Adicionalmente, La Empleadora proveerá a La Empleada una habitación y un baño privado, así como tres comidas al día, durante seis días a la semana. No se requerirá la presencia de La Empleada en la residencia de La Empleadora salvo durante las horas de trabajo.

**TERCERO.-** La Empleadora se compromete a asegurar a La Empleada horarios diarios de descanso, así como 24 horas continuas de descanso semanal, sin obligación de que permanezca en la residencia de La Empleadora. Las horas extras se pagarán de acuerdo con la legislación del Estado de Nueva York a razón de catorce dólares con setenta y tres centavos (US$ 14.73) por hora. Los descansos por feriados serán previamente acordados con La Empleadora y, en caso de trabajar, serán abonados de acuerdo con la legislación aplicable.

**CUARTO.-** La Empleada se compromete a:

a) Trabajar exclusivamente prestando servicios a La Empleadora.

b) Prestar servicios con diligencia, honestidad, reserva y lealtad.

c) Respetar las disposiciones de orden doméstico dictadas por La Empleadora.

d) Guardar absoluta reserva sobre la vida e incidentes en la residencia de La Empleadora que guarden relación con su esfera privada y la de su familia.

e) Poner en conocimiento de La Empleadora cualquier situación que entorpezca el normal desarrollo de sus labores.

f) Retornar al Perú junto con la familia de La Empleadora.



**QUINTO.-** La Empleada tendrá derecho a un período vacacional de quince días al año, con goce de haber, que podrá cumplir en fecha coordinada previamente con La Empleadora.

**SEXTO.-** La Empleadora sufragará los pasajes de La Empleada hacia los Estados Unidos de América y de regreso al Perú al término de la relación laboral.



**SETIMO.-** Los documentos de identidad y de viaje de La Empleada permanecerán en su poder en todo momento.

**OCTAVO.-** El presente contrato regirá desde la fecha de su suscripción hasta que La Empleadora concluya sus funciones oficiales en los Estados Unidos de América.

**NOVENO.-** El contrato podrá ser rescindido por cualquiera de las partes, sin expresión de causa, dando a la otra parte aviso previo de no menos de treinta días.

**DECIMO.-** Queda entendido que, sin desmedro de los privilegios e inmunidades que han sido reconocidos a La Empleadora, ésta y La Empleada respetarán las leyes, reglamentos y directivas federales, estatales y locales del Estado receptor que sean aplicables al presente contrato.

**DECIMO PRIMERO.-** Las Partes convienen que cualquier controversia derivada de la ejecución de este contrato será resuelta por los tribunales peruanos.

En fe de lo cual, firman el contrato en triplicado, a los quince días del mes de setiembre de dos mil doce.

MARITA ANGÉLICA PUERTAS PULGAR
DNI ███0618

MARIA ESMERALDA RIOS FUN
DNI ███7503

## CONTRACT FOR SERVICES

This deed records the contract for services, entered into by the First Secretary Marita Angelica Puertas Pulgar, member of the Mission of Peru to the United Nations, residing at 323 Black Oak Ridge Road, Wayne, N.J. 07470, with diplomatic passport No. ███0618 that shall hereinafter be designated as the "employer" and Ms. Maria Esmeralda Ríos Fun of Peruvian nationality, identified with regular passport No. ███0271, that shall be hereinafter be designated as the "employee", with the following terms and conditions.

First.- The object of this contract are the services performed as Housekeeper by the employee.

Second.- The employee will work only for the employer named in the contract, five days a week for 7 hours per day for a total of thirty five (35) hours per week. It will be the employee's right to have paid holidays, sick days and a paid vacation period of 15 days per year; and two days off every week.

Third.- The employee will receive a wage of US$ 9.82 (nine dollars and 82 cents) per hour. The employee will receive her salary every month without any deduction.

Fourth.- The employer will provide to the employee with an airline ticket New York-Lima for returning to her homeland.

Fifth.- The employer will contract a medical insurance in the employee's name. He will also provide her with lodging and meals.

Sixth.- Under no circumstances, the employer will retain any personal property of the employee, like her passport, visa or copy of this contract. The employee presence at the residence of the employer will be only required during her working hours.

Seventh.- This contract will be in effect since the date of its signing until one of the parties finishes it on her own. The employee accepts to perform her services in a diligent, honest and responsible way.

Eighth.- The contract shall finish when the employer ceases to work at the Permanent Mission of Peru to the United Nations, and/or by either of the parties, without statement of cause, giving prior notice of not less than thirty days.

Both parties declare that they have acted freely and under no pressure whatsoever to enter this contract.

In testimony whereof, they sign this contract in duplicate, on the fifteenth day of September of 2012

**MARITA ANGÉLICA PUERTAS PULGAR**
**Employer**
**Diplomatic Passport:** ███0618

**MARIA ESMERALDA RIOS FUN**
**EMPLOYEE**
**REGULAR PASSPORT:** ███0271

## CONTRACT TO PROVIDE SERVICES

Through this document it is stated the Contract for the Provision of Services signed in accordance with the directives of the Ministry of Foreign Affairs of Peru, by, on the one hand, First Secretary Marita Angelica Puertas Pulgar, Diplomat at the Permanent Mission of Peru to the United Nations, Peruvian identified with DNI ███████8949, and Passport No. ████0618 residing at 323 Black Oak Ridge Road, Wayne, New Jersey, NJ 07470, who henceforth be known as The Employer and on the other, María Esmeralda Ríos Fun, Peruvian, identified with DNI ████7503 and Passport No. ███0271, residing in Lima, Peru, who henceforth be known as the Employee, under the following terms and conditions:

FIRST. - The object of this contract is the provision of services such as home assistant that the Employee will render in the residence of the Employer, beginning on October 15, 2012.

SECOND .- The Employee will work thirty five hours a week, and will charge per hour a rate of nine U.S. dollars eighty two cents (U.S. $ 9..82). Besides this, the Employer will provide the Employee with a bedroom and a bathroom for her exclusive use, three meals a day, six days a week. The Employee's presence in the Employer's residence will not be required except during working hours.

THIRD .- The Employer is committed to ensuring the Employee daily periods of rest and 24 hours of continuous weekly rest. Overtime is paid in accordance with the laws of the State of New York at the rate of fourteen dollars and seventy three cents (U.S. $ 14.73) per hour. Breaks for holidays will be previously agreed with the Employer and, if work will be paid in accordance with applicable law.

FOURTH .- The EMPLOYEE shall:

a) Work exclusively providing services to the Employer.
b) She will provide services with diligence, honesty, discretion and loyalty.
c) She will maintain absolute secrecy about the life and incidents in the residence of the Employer, whether they relate to the private sphere of the employer and his family or to the official business that takes place there.
d) Inform the employer any situation that impedes the normal development of her work.
e) Return to Peru altogether with the Employer and his family.



FIFTH .- The EMPLOYEE shall be entitled to a vacation paid period of fifteen days per year, which may be taken at a date coordinated in advance with the Employer.



SIXTH .- The Employer shall pay the fares of the Employee to the United States of America and return to Peru at the end of the employment relationship.

SEVENTH. - The identity and travel documents of the Employee remain in her possession at all times.

EIGHTH. - The present contract shall take effect from the date of signature until the return of the Employer when he fulfilled his due assignment.

NINTH. - The contract may be terminated by either party, without cause, by giving the other party notice of not less than thirty days in advance.

TENTH .- It is understood that, without loss of privileges and immunities have been granted to the Employer, the Employer and the Employee shall respect the laws and regulations of federal, state and local authorities of the receiving State which are applicable to this contract.

ELEVENTH.-  Both parties agree that any legal situation from the contra be solved by the Peruvian Laws.

Signed by both parties in a number of three original documents on Sep 15, 2012

**MARITA ANGELICA PUERTAS PULGAR**
**DNI**     **8949**

**MARIA ESMERALDA RIOS FU**
**DNI**     **7503**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2013, I electronically filed the foregoing document with the

United States District Court for the District of New Jersey by using the CM/ECF system.  I

certify that counsel for Defendants Marita Puertas Pulgar and Alexis Aquino Albegrin are

registered as ECF Filers and that they will be served by the CM/ECF system.

/s John D. Tortorella_____
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1448
(973) 824-9300 (phone)
(973) 824-8425 (fax)
jtortorella@khmarino.com